# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 20 2018, 11:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael A. Jackson, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 20, 2018 <br><br> Court of Appeals Case No. <br> 19A05-1711-CR-2728 <br><br> Appeal from the Dubois Circuit Court <br><br> The Honorable Nathan A. Verkamp, Judge <br><br> Trial Court Cause No. <br> 19C01-1609-F1-793 |

**Najam, Judge.**

# Statement of the Case

Michael A. Jackson, Jr. appeals his convictions for three counts of child molesting, one as a Level 1 felony, the second as a Level 4 felony, and the third as a Class C felony; two counts of criminal confinement, as Level 5 felonies; and criminal confinement, as a Class C felony, following a bench trial. He raises two issues for our review, which we restate as follows:

1. Whether the State presented sufficient evidence to support his convictions.

2. Whether his sentence for his conviction of child molesting, as a Level 1 felony, is inappropriate in light of the nature of the offense and his character.

We affirm.

# Facts and Procedural History

A.J. ("Mother") entered into a relationship with Jackson in 2008 and the two were married in 2013. Mother had two prior children, B.A. and C.Y. ("Brother"), who resided with Mother and Jackson. Mother and Jackson had one child together, Aa.A. ("Sister"). In early 2012, the family moved into a house on Villa Drive in Jasper. While they resided in that house, B.A. shared a room with Brother and Sister. At the end of the year, the family moved into a house on 14th Street, which was also in Jasper.

In August 2016, B.A., who was ten years old, called her father, A.A. ("Father"), and told him that Jackson "was touching [her] inappropriately."

Tr. Vol. II at 142. While she was on the phone with Father, B.A. got "very" upset. *Id.* at 58. After the call ended, Father called Mother to let her know what B.A. had told him. After Father spoke with Mother, Mother made an appointment for B.A. to see a social worker.

[5] On September 1, Shannon Egg, a social worker, saw B.A. for "[a]nxiety related to sexual abuse." *Id.* at 23. During the visit, B.A. disclosed to Egg that she had been sexually abused. Based on what Egg had learned from B.A., she filed a report with the Department of Child Services ("DCS"). That same day, Stephanie Gilmour, a DCS employee, went to the family's home in order to investigate the suspected sexual abuse. After speaking with B.A., Gilmour decided that B.A. should not be in the same home as Jackson, and B.A. went to stay with her grandparents. Gilmour also scheduled a forensic interview for B.A., which Gilmour later observed. After the forensic interview, Gilmour substantiated B.A.'s claims and turned the case over to a caseworker.

[6] Sergeant George Hettinger with the Jasper Police Department also went to the family's home on September 1 in order to assist Gilmour. After he had arrived, Sergeant Hettinger observed Gilmour interview B.A. Thereafter, on September 9, Sergeant Hettinger arrested Jackson. The State charged Jackson with child molesting, as a Class C felony (Count I); criminal confinement, as a Class C felony (Count II); child molesting, as a Level 4 felony (Count III); criminal

confinement, as a Level 5 felony (Count IV); child molesting, as a Level 1 felony (Count V); and criminal confinement, as a Level 5 felony (Count VI).[1]

[7] Jackson waived his right to a jury trial, and the court held a bench trial on August 8, 2017. During the trial, B.A. testified that she got along well with Jackson at first, but that changed after "he started touching [her]." *Id.* at 131. She further testified that Jackson touched her "[w]here [she] use[s] the restroom." *Id.* at 132. During her testimony, the following conversation occurred:

> [State]: What did he touch you with?
>
> [B.A.]: His hand.
>
> [State]: Okay. And what did he do with his hand?
>
> [B.A.]: Rubbed.
>
> [State]: He rubbed on what?
>
> [B.A.]: My private part.[2]

---

[1] Counts I and II were based on allegations that Jackson had touched and confined B.A. between February 1, 2012, and June 8, 2014. Counts III and IV were based on allegations that Jackson had touched and confined B.A. between July 1, 2014, and October 31, 2015. And Counts V and VI were based on allegations that Jackson had performed sexual conduct and confined B.A. between November 1, 2015, and August 31, 2016.

[2] The State used an anatomically correct drawing of a girl and asked B.A. to identify where Jackson touched her. B.A. circled the vagina, which she referred to as her "private part." *Id.* at 133, Ex. at 8.

[State]: Okay. And was he touching you under your clothes or over your clothes.

[B.A.]: Both.

* * *

[State]: Did he touch you this way several times?

[B.A.]: Yes.

[State]: So sometimes he touched you under the clothes?

[B.A.]: Yes.

[State]: But sometimes over?

[B.A.]: Yes.

[State]: Okay. When he touched you under the clothes, how did that happen? Can you tell the judge exactly how he managed to touch you under your clothes?

[B.A.]: He would pull my pants down.

[State]: Okay. He would pull down your pants, and then what?

[B.A.]: He would just start rubbing.

[State]: And what would you do?

[B.A.]: Sometimes I had tried to get away.

[State]: Okay. Were you able to get away?

[B.A.]: No.

[State]: What did he do to keep you from getting away?

[B.A.]: He would grab my arm and push me back in the position I was in.

*Id.* at 133-34.

[8]   B.A. testified that Jackson touched her for the first time when they lived on Villa Drive. B.A. further testified that she would sometimes watch television in Mother and Jackson's room, and that Jackson would touch her while she was in their room watching television. B.A. testified that Jackson continued to touch her even after they moved to the house on 14th Street and that, one time, Jackson touched her in a way that was different from the other times. She stated that on one occasion, Jackson did more than touch the outside of her vagina, but that he "got underneath the lips"[3] and was "[g]rabbing and rubbing." *Id.* at 139. She further testified that Jackson kept her from getting away that time when he "grabbed [her] arm and then held [her] back." *Id.* B.A. also testified that, one time while they lived in the house on 14th Street, he

---

[3] B.A. used a diagram of female anatomy to determine where the touching had occurred.

"asked [her] if it felt good." *Id*. at 135. B.A. testified that Jackson told her not to talk to anyone about his actions because "it was [their] little secret." *Id*. at 145.

[9] The State also presented the testimony of Egg, Gilmour, Father, Mother, and Brother at trial. Egg testified that B.A. had disclosed to her that B.A. had been sexually abused. Egg also testified that it is "pretty common" for children who have reported sexual abuse to have behavioral problems that include anxiety, fear, and depression and that their school work is usually affected. *Id*. at 21. She further testified that she is still seeing B.A.

[10] Father testified that he had noticed that B.A. had been "lashing out" and that her grades, which had been decent during the prior school year, "were not very good" from August to December 2016. *Id*. at 62. And Mother testified that B.A. was "afraid" of Jackson. *Id*. at 85. Brother testified that B.A. would sleep in Jackson's room occasionally. He testified that he did not think there was a problem with B.A. sleeping in Jackson's room when she was younger, but that it bothered him later because, as he put it: "it just—it seemed different to me about how she was older, you know. She was—it just—I don't know. It seemed different." *Id*. at 101. Brother also testified that they would sometimes watch television in Mother and Jackson's bedroom. Brother further testified that B.A. had told him that she had been a victim of sexual abuse and that B.A. would start crying when she told him about it. Jackson did not testify. At the end of the bench trial, the court took the matter under advisement.

On August 16, the trial court found Jackson guilty as charged on all six counts and entered judgment of conviction accordingly. At the sentencing hearing on September 19, the trial court did not identify any mitigating circumstances and sentenced Jackson to the advisory sentences for all six convictions, which included four years for Count I, four years for Count II, six years for Count III, three years for Count IV, thirty years for Count V, and three years for Count VI, to be served concurrently. This appeal ensued.

# Discussion and Decision

## Issue One:  Sufficiency of the Evidence

Jackson first contends that there is insufficient evidence to support his convictions. Jackson claims that there was insufficient evidence to support his convictions because his convictions were only based on B.A.'s testimony at trial, which he claims was incredibly dubious. Specifically, he asserts that her testimony is incredibly dubious because "B.A. is not only imprecise in her memory concerning dates, in most instances she is years off in her account, and, as far as frequency, from a few times to every time they were alone." Appellant's Br. at 16.

For the incredible dubiosity rule to apply, there must be:  "1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion, and 3) a complete absence of circumstantial evidence." *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015). Here, B.A. was not the "sole testifying witness." *Id.* Rather, Egg, Gilmour, Father, Mother, and Brother all testified

and partially corroborated B.A.'s testimony. Further, B.A.'s testimony was corroborated by ample circumstantial evidence. As such, the incredible dubosity rule does not apply.

Nonetheless, Jackson also asserts that the State failed to present sufficient evidence because the State's burden of proof at trial should have been "'strict proof' beyond a reasonable doubt." Appellant's Br. at 18. But Jackson offers no authority for such a standard. We hold that the State presented sufficient evidence to support Jackson's convictions.

### Issue Two: Inappropriateness of Sentence[4]

Jackson also contends that his sentence for child molesting, as a Level 1 felony, is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This court has recently held that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839,

---

[4] Jackson initially states that the trial court committed an "abuse of discretion" when it sentenced him because the "trial court, and its probation department, did not articulate any mitigating circumstances." Appellant's Br. at 19-20. However, Jackson's actual argument is a challenge to "his sentence under Indiana Appellate Rule 7(B)[.]" *Id*. Therefore, we will only analyze whether his sentence is inappropriate in light of the nature of the offense and his character, and we will not consider whether the trial court abused its discretion.

844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has recently explained that:

> The principal role of appellate review should be to attempt to leaven the outliers . . . but not achieve a perceived "correct" result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind.), as amended (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

*Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (omission in original).

[16] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[17] Here, the trial court convicted Jackson of child molesting, as a Level 1 felony.[5] The sentencing range for child molesting, as a Level 1 felony, is twenty years to fifty years, with an advisory sentence of thirty years. Ind. Code. § 35-50-2-4(c) (2018). The trial court did not identify any mitigating circumstances. And, while the trial court did not specifically identify any aggravating circumstances, it stated that "the aggravators don't, in my opinion, justify doing above the advisory sentence[.]" Tr. Vol. II at 201. Accordingly, the trial court sentenced Jackson to the advisory sentence of thirty years with the Department of Correction.

[18] Jackson asserts that his thirty-year sentence is inappropriate in light of the nature of the offense because the aggravating circumstances "found by Probation are not significant, [are] contained within the charges themselves, and the 'significant and greater' harm to the victim is ameliorated by the number of serious felonies (six) with which Jackson is charged." Appellant's Br. at 22. Jackson also contends that his sentence is inappropriate in light of his character because he "he has a moderate risk assessment, his prior arrests were [from] 1994 and before, he is likely to positively respond to probation, he has never been incarcerated in the DOC, [and he] has exhibited good behavior in

---

[5] Jackson does not specifically dispute his sentences for any of the other convictions. Rather, he only contends that he "should be sentenced to less than the 30-year advisory sentence on Count 5[.]" Appellant's Br. at 24.

jail[.]" Appellant's Br. at 20. He further asserts "that a 30-year sentence for a 51-year old man is unreasonable." *Id*. at 22. We cannot agree.

[19] Jackson was convicted on Count V for a Level 1 felony that was part of a pattern of conduct which occurred over time. Not only did Jackson assault B.A., but he resisted her efforts to escape from his grasp. Further, Jackson asked B.A. "if it felt good." *Id*. at 135. Jackson also told B.A. to never talk about what happened because it was their "little secret." *Id*. at 145. And, significantly, Jackson was B.A.'s stepfather. As such, Jackson abused his position of trust with B.A. Under these facts and circumstances, we cannot say that Jackson's sentence is inappropriate in light of the nature of the offense or his character. Accordingly, we affirm his sentence.

[20] Affirmed.

Robb, J., and Altice, J., concur.